**Adrien DeLOACH, Plaintiff–Appellant,**

v.

**INFINITY BROADCASTING,**
**Defendant–Appellee.**

No. 98–1617.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1998.

Decided Jan. 12, 1999.

Christopher V. Langone (argued), Chicago, IL, for Plaintiff–Appellant.

Arnold H. Landis, Chicago, IL, Cameron A. Stracher (argued), CBS, Incorporated, New York, NY, for Defendant–Appellee.

Before POSNER, Chief Judge, and BAUER and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Disc jockey Adrien DeLoach contends that his radio station demoted him in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* The district court dismissed the case on the station's motion for summary judgment, a decision DeLoach challenges on this appeal.

DeLoach was born in 1950 and was 46 years old at the time of his demotion. He had worked for Infinity Broadcasting for about 11 years. Infinity ran WJJD–AM, for whom DeLoach did a morning drive-time show at one time, and WJMK–FM, for whom he later did a night shift as host of a program that played music by artists like Tony Martin, Peggy Lee, and Frank Sinatra. His official position, under the contract with his union, the American Federation of Television and Radio Artists (AFTRA), was that of a "staff announcer."

In approximately April 1993 WJJD began to change its format from music to a predominantly syndicated talk radio format—with programs ranging from the rantings of former Watergate bad guy G. Gordon Liddy to the railings of self-proclaimed "Shock Jock" Howard Stern. The transitional period continued until May 1996. In early 1995 DeLoach was earning about $990 per week. But in May 1996 he and three other "staff announcers" were reclassified as "combo announcers" at a salary of about $537 a week.

The reorganization and the lowered salaries resulted from a collective bargaining agreement and grew out of the change in duties which came with the new format. All employees of WJJD were members of AFTRA. Under the "old" agreement, effective from 1993 to 1996, there were no "combo announcers." But the new agreement effective for 1996–1999 established such a category for its on-air personnel. A combo announcer was defined as an "announcer who functions as board operator and also performs limited on-air services" necessary for the syndicated talk-show format. Staff announcers, including DeLoach, who wished to stay at the station as combo announcers could retain their jobs, but, as we said, with slashed salaries. Staff announcers who did not wish to stay at the station as combo announcers were offered a severance package, which they had 21 days to accept. In addition to DeLoach, the persons affected by this change were Hugh Copland, who was 64 years old; Robert Hale, age 63; and Anthony Walker, who was 39.

On May 9 DeLoach accepted the severance package. He received $13,866 in severance and $577 in accrued vacation time. He signed a release saying that he had no further claims against WJJD/WJMK. DeLoach then filed this suit under the ADEA and Infinity moved for summary judgment, which District Judge Charles P. Kocoras granted.

We review the district court's ruling *de novo*, viewing the facts and drawing all reasonable inferences in favor of the nonmoving party. *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389 (7th Cir.1998).

The ADEA prohibits an employer from demoting a person based on age. *Smart v. Ball State Univ.*, 89 F.3d 437 (7th Cir.1996). The burden is on the plaintiff to show that his age was a determining factor in the employment decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). We look to see whether age tipped the balance—that is, but for his age the plaintiff would not have suffered the adverse decision. *Weisbrot v. Medical College of Wisconsin*, 79 F.3d 677 (7th Cir.1996). A plaintiff may prove his case through either direct or indirect evidence. *Adreani.* As is often true in these cases, DeLoach has no direct evidence of age discrimination, relying instead on the indirect, burden-shifting method of proof set out in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Under that formula a plaintiff must establish a prima facie case; if he does so, the employer must provide a legitimate, non-discriminatory reason for the employment action. Finally, the plaintiff must show that the reason offered was not the employer's true reason but was instead a cover for discrimination. *Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297 (7th Cir.1996). The ultimate burden of proving intentional age discrimination, regardless of the burden-shifting procedure, however, remains on the plaintiff. *St. Mary's*; *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860 (7th Cir.1996).

The contention on this appeal is that Judge Kocoras erred in his findings that younger employees were not treated more favorably than DeLoach (an element of the prima facie case) and that Infinity's proffered reasons for the employment action were not pretextual. Either finding is dispositive, and we agree with both of them.

■ The first two elements of a prima facie case are conceded by Infinity—DeLoach was in the protected class and he was performing satisfactorily. As to the third element, Judge Kocoras found that DeLoach suffered an adverse employment action. But the judge also found that DeLoach did not present facts from which a jury could draw the inference that younger employees were treated more favorably than he was.

DeLoach says that the evidence he presented shows that within 2 months of the demotions, the station, having filled the previous staff announcer positions with younger people, switched back to a music format—in fact, playing the same music as before. And, in what is crucial to his case, he contends that the younger people, hired as combo announcers, became staff announcers once the format reverted to music. The implication of his theory is that the whole switch was orchestrated to allow the station to get rid of older employees and place younger workers in their seats. The younger workers are now, DeLoach says, staff announcers with staff-announcer salaries.

The insurmountable problem with this perfectly good theory is that DeLoach does not present any evidence that the newer employees were reclassified as staff announcers or as to what the salaries of the newer employees became. What must be kept in mind is that DeLoach was offered a position as a combo announcer. An inference which can be drawn from the record is that he turned it down because it carried a significant salary cut. *If*, after he left the job, those hired as combo announcers were soon being paid as much as staff announcers, then he meets his prima facie case. But that's a big "if"—and one for which there is no proof, even though it would seem to be a simple matter to find out what the job classifications and salaries became. DeLoach did not ask Infinity about these matters either in depositions or interrogatories.

Nevertheless, he contends that he has presented evidence from which the inference he wishes to draw can, in fact, be drawn. He says that the average age for the departing employees was 53, while the average age of the new employees was 31.5, a difference which is statistically significant. He also contends that 23–year–old Eric Zapchenk was given a pay raise at about this time. DeLoach presents his own affidavit to the effect that about 3 months after the station "had gotten rid of the older on the air staff ... it went back to playing the music—now with the younger new employees on the air as the disc jockeys/staff announcers." The latter proposition is also based on a statement in the deposition of John Hurni,[1] WJJD's chief engineer, to the effect that the younger announcers began playing music after the format change.

■ This "evidence" simply will not allow the conclusion DeLoach urges. There is evidence that the station switched back to a music format—DeLoach said he heard it and Hurni said that is, in fact, what the station did. It is telling, however, that these statements are conclusory. DeLoach says:

> About three months after the station (through Pearlman [Harvey Pearlman, general manager of the station]) had gotten rid of the older on the air staff (including myself) it went back to playing the

---

1. Sometimes spelled Hearney in the record.

music—now with the younger new employees on the air as the disc jockeys/staff announcers.

Hurni was asked about the format:

Q. At the time, for instance, well, how would you describe the age of the—of the on air personalities at the time of WJJD's demise in 1996 and 1997? I understand right before it went off the air it was—

A. Yes.

Q. —you went back to music format; right?

A. Yeah, just briefly for—

Q. And—

A. —three or four months and that time it was very much young people at that time.

Q. Okay. What were the—what were the—at that last music portion, what were—what kind of music was being played?

A. They went back to the original format.

Q. Okay. But they had younger staff announcers playing that music?

A. Yes.

Hurni, rather haphazardly it would seem, agrees that the "younger staff announcers" were playing the music. There is no follow-up question regarding whether these people were, in fact, staff announcers. This off-the-cuff statement is an insufficient foundation for DeLoach's claim. There simply is no evidence that the new employees became staff announcers, as that term of art is used in the collective bargaining agreement, and there is no evidence that they began being paid under a higher salary scale. Hard evidence of salaries paid should not be hard to gather. Yet DeLoach did not ask the pertinent questions at the depositions he took of Infinity personnel. He did not submit interrogatories. He did not seek to discover personnel files. As to the pay raise to one employee, Zapchenk, there is no evidence as to what his job was, so his pay raise proves nothing. DeLoach never says Zapchenk was a staff announcer or any kind of announcer. He is not shown to be a similarly situated younger employee. Finally, standing alone, the statistical disparity does not carry the

day. *EEOC v. Francis W. Parker School,* 41 F.3d 1073 (7th Cir.1994), *cert. denied,* 515 U.S. 1142, 115 S.Ct. 2577, 132 L.Ed.2d 828 (1995).

We are well aware that we view the facts and draw all reasonable inferences in favor of the nonmoving party. However, the nonmoving party is not entitled to rely on conclusory allegations, unsupported by the record. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In a situation in which evidence, if it exists, should be easy to obtain, DeLoach has failed to produce anything from which one could infer that younger workers were treated more favorably than he. He cannot, therefore, establish a prima facie case.

We will briefly discuss the other finding which DeLoach attacks: that the reason Infinity gave for the employment action was not a pretext for discrimination. The reason given was, as we have said, that the format changed, resulting in less on-air time for the announcers; because of the decreased duties, the jobs were "reclassified"—*i.e.,* pay was lowered—pursuant to a labor agreement with DeLoach's union.

DeLoach says in his affidavit that the reason given was a pretext because, although he had different duties after the format change, his on-air time did not significantly decrease. However, this statement contradicts his deposition where he said his on-air time decreased substantially. His affidavit, therefore, cannot create an issue of fact. *See Darnell v. Target Stores,* 16 F.3d 174, 176–177 (7th Cir.1994).

DeLoach also contends that the station was actually moving away from the "adult standard format" aimed at older listeners and was trying to attract younger listeners. Announcers were told, he says, not to put a person on the air as a caller if he sounded old. And, he added, disc jockeys were told not to say what year a song was recorded because that would remind the audience of how old the music was. Other statements which allegedly showed an age bias were that a fellow named Robert Hale was referred to as an "old lady"; a management employee,

Rick Patton, remarked that Hugh Copland was "quick" and did a good job for "someone his age." DeLoach was termed by General Manager Harvey Pearlman as "part of an old boys network." Pearlman also asked Hugh Copland how old he was and then said "well we all get there sometime." WJJD's program director was heard to say that management was "going through with it and getting rid of all the old people." All of this taken together, according to DeLoach, allows an inference of discrimination under a *McDonnell Douglas* indirect method of proof, even if it would not be sufficient as direct proof, citing *Huff v. UARCO, Inc.*, 122 F.3d 374 (7th Cir.1997).

Pearlman was the decision-maker. His only comments were to ask Copland how old he was and to say that DeLoach was part of an old boys network—the latter a comment often denoting those in power, rather than those who are simply old. The comments attributed to the other employees are not helpful to DeLoach. There is no indication as to when those comments were made; they are fairly innocuous, and they were not made by decision-makers. There is insufficient evidence from which to conclude that the proffered reasons for the change in job classifications was a pretext for discrimination.

The judgment of the district court is AF-FIRMED.