William D. WILSON, Plaintiff–Appellee,

v.

**AM GENERAL CORPORATION,**
Defendant–Appellant.

No. 97–3442.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 24, 1998.

Decided Feb. 4, 1999.

John C. Hamilton (argued), Doran, Blackmond, Ready, Hamilton & Williams, South Bend, IN, for Plaintiff–Appellee.

Gerald F. Lutkus (argued), Janilyn Brouwer Daub, Barnes & Thornburg, South Bend, IN, for Defendant–Appellant.

Before COFFEY, MANION and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff–Appellee William Wilson was 60 years of age and had been employed by Defendant–Appellant AM General Corporation for thirteen years when he was terminated. Wilson brought suit against AM General under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), and alleged he was discharged because of his age. AM General responded that Wilson lost his job because of a company-wide reduction in force ("RIF"), and because of his allegedly poor relationships with a fellow AM General employee and two large AM General customers. Wilson's case went to trial, and following the presentation of his case-in-chief, AM General moved for Judgment as a Matter of Law and the district court denied the motion. AM General proceeded to present its case, and the jury returned a verdict in favor of Wilson. Following the verdict, AM General renewed its motion for Judgment as a Matter of Law, or in the alternative moved for a new trial, and the trial court denied that motion. AM General appeals the district court's denial of its Rule 50 motions. We AFFIRM.

## I. BACKGROUND

AM General manufactures High Mobility Multipurpose Wheeled Vehicles (HMMWVs) for sale primarily to the United States military. In 1988, AM General management decided to examine the potential for manufacturing a commercial, nonmilitary version of the HMMWV called the HUMMER. Wilson, who had been employed by AM General for seven years, was named Manager of the HUMMER Business Development Office, and one year later, in 1989, was assigned to study and analyze the market potential for the HUMMER. Based in part on Wilson's findings and recommendations, AM General decided to pursue the HUMMER concept and designed, manufactured, and eventually offered for sale the HUMMER product.

A few years later, in 1993, AM General realized that due to the expiration of an AM General/United States military contract in early 1995, the United States military would greatly reduce its orders for HMMWVs. AM General determined that as a result, it needed to develop a greater market share for the HUMMER, and at the same time cut the company's operating costs. AM General's cost-cutting measures included switching its method of pay increases for its salaried employees from percentage increases to lump sum distributions. This switch was announced during a presentation to salaried employees by James A. Armour, President of AM General. Wilson alleges, in support of his ADEA claim, that during the presentation Armour remarked that "some of the senior, more mature people ... would be surprised or would be impacted by the upcoming layoffs."

In October of 1993, AM General began a reduction in force that would be ongoing for nearly two years. As part of the RIF, Armour directed Jeffrey C. Wright, Senior Vice President of Worldwide Marketing and Strategic Planning, to eliminate one of the four salaried employees who reported directly to Wright ("direct reports"). At that period in time, Wright had four direct reports: two individuals, ages 42 and 45, who worked in AM General's international sales division; another director, age 62, who had other employees reporting directly to him and whose group also had been asked to reduce its staff; and Plaintiff–Appellee Wilson. During this particular timeframe, Wilson was working in the HMMWV department, where he dealt with a number of AM General customers, including the United States Army, the United States Air Force, Tank Automotive Command ("TACOM") and others, in an effort to understand how customers used the HMMWV and to determine what sorts of features were desirable to AM General's customers. Wilson was also a member of a

team working to develop a fire truck version of the HMMWV.

In March of 1994, Wright recommended Wilson be dismissed and 60–year–old Wilson was terminated. During the meeting at which Wilson was advised of his termination, he inquired of Wright whether he was being terminated because of his poor performance, and Wright responded, "Absolutely not!". By 1995, the RIF had resulted in the termination of 41 AM General employees.

Wilson filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Wilson a right-to-sue letter, and on February 21, 1995, he filed a complaint in the United States District Court for the Northern District of Indiana, South Bend Division, alleging ADEA violations. Discovery proceeded, including AM General's filing its Fed. R.Civ.P. 26(a) Mandatory Disclosures, which identified only Jeffrey Wright and Gary Wuslich (AM General's Vice President of Human Resources) as individuals who possessed "information regarding the decision to eliminate [Wilson's] position." In June of 1996, Wilson deposed Wright and Wuslich. Wright contradicted the stance he had taken at Wilson's termination meeting (wherein he stated that Wilson's termination had nothing to do with his performance), and for the first time alleged that Wilson's discharge was the result of his poor working relationships with (1) Mr. Paul Goncz, the Director of AM General's Washington lobbying operations; (2) O'Gara–Hess, the company which armed HMMWVs for the United States armed forces; and (3) TACOM, the procurement agency for the United States military and one of AM General's principal customers.

Wilson's two-day trial commenced on October 21, 1996. During the trial, AM General focused on providing age-neutral, nondiscriminatory reasons for Wilson's discharge. Wright testified that because AM General was attempting to emphasize its international sales to offset the downturn in United States government sales, he chose not to terminate the two international sales employees who reported to him. Moreover, Wright testified that Wilson was the only person he could select for termination in view of the fact that the majority of his responsibilities related to U.S. military and government business, which was shrinking. And, when asked about the termination meeting with Wilson, Wright testified that at the time of the meeting, he believed it was best not to go into specific reasons for the termination decision, but rather to sever the relationship quickly.

The company attempted to establish that Wilson's aforementioned relationships with Goncz, O'Gara-Hess, and TACOM led to AM General's decision to terminate Wilson. Because the depth and content of these three relationships go to the heart of this case, we summarize the relevant trial testimony as follows.

### The Wilson/Goncz Relationship.

From 1991 until early 1993, Wilson reported to CEO Armour. In or about March of 1993, Armour approached Wilson and requested that he report to Paul Goncz, the director of AM General's Government Affairs Division (a lobbying division in Washington D.C.). At trial, Wilson testified that he "had questions" about the arrangement and "fought terribly" with Armour over the reassignment, but eventually consented to the change because Armour felt it was good for the company. Wilson stated that he reported to Goncz for only seven months (until October of 1993), and admitted that he told Armour he "resented" working for Goncz, and also testified that he and Goncz had "very little" interaction and that their relationships were on a "professional" level. Wilson proceeded to describe Goncz as a "ghost boss" who knew "nothing about marketing or sales," and who never called, wrote nor visited Wilson's office. Finally, Wilson testified that at no time did he and Jeffrey Wright discuss Wilson's relationship with Goncz.

Wright, testifying on behalf of AM General, stated that Wilson was "extremely upset" with the change in reporting to Goncz, and described the relationship between Wilson and Goncz as "[o]il and water. Apples and oranges. Just a mismatch. Just one of those unfortunate organizational things that occur from time to time." Wright described Goncz as having a style of communicating that was "difficult and [did] not lend itself to

close working relationships, whether it be with Bill Wilson or others within the company." In fact, Wright admitted that "as I spent more time in the company it became clear that [Wilson] and [Goncz], and subsequently I will include myself ... and Goncz had some problems."

Despite these alleged problems, Wilson proffered evidence demonstrating that his performance while working for Goncz earned him a lump sum merit payment corresponding to an "excellent" rating, which Armour increased to an "outstanding" rating. Moreover, Wilson was no longer reporting to Goncz at the time he was discharged. The record does not reveal Mr. Goncz's feelings on the issue, as he did not testify at trial.

### The Wilson/O'Gara–Hess Relationship.

O'Gara–Hess was an armoring company which had been selected by TACOM to arm the AM General vehicles for the armed forces. Wilson testified that his contact with O'Gara–Hess consisted of speaking with O'Gara–Hess representative Tom Buckner at least once or twice a week, and that the two of them would fax things back and forth, eventually creating and submitting a weekly report to TACOM. Wilson testified that the relationship was "very professional" and that Buckner "never ... express[ed] any problem to me." Wilson stated that he had met Tom O'Gara, the Chairman of the company, but that he never had personal dealings with him, because Mr. O'Gara was "out of my league." Wilson also testified that nobody from AM General ever mentioned to Wilson any alleged difficulty he was having working with representatives of O'Gara-Hess.

Wright, on the other hand, testified that Wilson had problems with O'Gara–Hess which started when the Army insisted that the HMMWVs be armored by O'Gara–Hess, even though AM General had developed a technology to arm the vehicles. O'Gara–Hess and AM General agreed to work together in the production and marketing of the armored HMMWVs, and each company's president signed two separate agreements formalizing the cooperative arrangement. Wright testified that he observed Wilson acting contrary to the spirit of the joint production and marketing arrangements during a meeting at Langley Air Force Base, wherein Wilson offered to send an Air Force representative a comparison of the pricing between a HMMWV armored by O'Gara–Hess, and one armored by AM General.

### The Wilson/TACOM Relationship.

TACOM was one of AM General's primary military customers. From October, 1993, through March 14, 1994, Wilson's department's responsibility was to obtain new orders for the HMMWV. This directive required that Wilson engage in business dealings with TACOM. Wilson testified at trial that his contact with TACOM representatives was "periodic," meaning less than once per week. Wilson denied having a poor relationship with TACOM, and asserted that AM General management never expressed concerns that any problems existed.

In addition, Wilson explained that the "guru of all tactical wheeled vehicles" at TACOM was Colonel John Stoddard, who was head of TACOM's Combat Support Division. Colonel Stoddard was an ROTC student of Wilson's in the 1960's, the two were both members of the Army Ordinance Corps (a branch service of the U.S. Army), and Wilson had maintained a friendship with Stoddard since that time. Wilson testified that he and Stoddard had spoken with one another at trade shows and meetings during the first half of 1994, and if there had been problems in Wilson's dealings with TACOM, Stoddard "would not have hesitated" to call him and discuss such problems, which he did not do.

Contrary to Wilson's testimony, Wright testified on behalf of AM General that TACOM representatives had complained about Wilson. Specifically, Wright stated that TACOM had complained that Wilson's conduct at Langley Air Force Base was undermining the TACOM/O'Gara–Hess efforts regarding armoring Air Force vehicles.

At trial, following Wilson's presentation of his case-in-chief, AM General filed a Motion for Judgment as a Matter of Law. Although AM General admitted that Wilson had established a *prima facie* case of age discrimination thus shifting the burden to AM General to articulate legitimate, non-discriminatory reasons for the discharge, the company ar-

gued that it had met this burden by articulating reasons (the poor relationships with Goncz, TACOM and O'Gara–Hess) and thus the burden shifted back to Wilson to show evidence of pretext. Finally, argued AM General, Wilson had failed to present sufficient evidence of pretext, in his case-in-chief, to prevail. The district court denied the motion. AM General presented its case, and on October 23, 1996, a jury returned a verdict in favor of Wilson and against AM General, and awarded Wilson $238,902.00. Thereafter, AM General filed a Motion for Judgment as a Matter of Law or, alternatively, for a New Trial. The trial court denied that motion, and entered a final judgment, receiving and accepting the jury's verdict. AM General appeals.

## II. ISSUES

(1) Whether the district court improperly denied AM General's Rule 50(a) motions for Judgment as a Matter of Law; and

(2) whether the trial court abused its discretion when it denied AM General's Rule 50(b) motion for a New Trial.

## III. DISCUSSION

A. *Whether the District Court Improperly Denied AM General's Rule 50(a) Motions for Judgment as a Matter of Law.*

(1) *Standard of Review and Analytical Framework of Wilson's ADEA Claim.*

Following Wilson's presentation of his case-in-chief, and again at the conclusion of trial, AM General moved for judgment as a matter of law as authorized by Federal Rule of Civil Procedure 50(a)(1), which provides, in relevant part, the following:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained ... without a favorable finding on that issue.

■ Specifically, AM General argued that Wilson failed to provide a legally sufficient basis for a reasonable jury to find that AM General's alleged nondiscriminatory reasons (poor working relationships) for Wilson's termination were mere pretexts for discrimination. The trial court denied AM General's Rule 50 motions, and we review the decisions *de novo. Collins v. Kibort*, 143 F.3d 331, 335 (7th Cir.1998).

■ Mr. Wilson's Complaint alleged, and at trial he attempted to prove, a claim under the ADEA which makes it illegal for an employer to "discharge any individual ... because of [the] individual's age." 29 U.S.C. § 623(a)(1). An ADEA plaintiff can prove age discrimination with either direct or circumstantial evidence. *See Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir.1998). Because Wilson, like many ADEA plaintiffs, could proffer no direct evidence proving that he was discriminated against because of his age, he attempted to prove his case with circumstantial evidence, and thus relied on the familiar *McDonnell Douglas* burden shifting model. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This Circuit succinctly described the *McDonnell Douglas* approach in *Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297, 302–03 (7th Cir.1996), and reiterated the approach in *Adreani*, 154 F.3d at 394, as follows:

> The familiar framework established in *McDonnell Douglas* necessitates a three-step inquiry. First, a plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. If the plaintiff makes out a prima facie case, a presumption of discrimination arises, and the burden shifts to the defendant to come forward with evidence of a "legitimate, nondiscriminatory reason" for discharging the plaintiff. Finally, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." (Quoting *Texas Dep't of Community Affairs v. Burdine*,

450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

AM General seemingly admits that Wilson established a *prima facie* case of age discrimination.[1] The company next argues that AM General provided evidence of legitimate, nondiscriminatory reasons for the discharge—namely, the allegedly poor working relationships that Wilson had with co-worker Paul Goncz, and customers TACOM and O'Gara–Hess. Finally, and more importantly, AM General alleges that Wilson failed, as a matter of law, to demonstrate that AM General's proffered reasons for termination were mere pretexts for age discrimination. Thus, the sole issue before this Court is whether Wilson provided a sufficient evidentiary basis for a reasonable jury to find that AM General's "poor working relationships" justification was a pretext for discrimination. See Fed.R.Civ.P. 50(a)(1); *see also Shank v. Kelly–Springfield Tire Co.*, 128 F.3d 474, 478 (7th Cir.1997). If so, we must affirm the trial judge's decision to send the case to the jury, and the jury's verdict.

■ An employee demonstrates pretext by offering evidence that the employer's "ostensible justification is 'unworthy of credence.' " *Testerman*, 98 F.3d at 303 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089) (other citation omitted). The employee must offer evidence "tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Id.* (citing *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 919 (7th Cir.1996)). An employee discharged in a RIF is not required to produce evidence tending to prove that the employer's explanation was a "lie" in the sense of its being a complete fabrication; instead, he must "establish that age 'tipped the balance' in favor of discharge." *Testerman*, 98 F.3d at 303 (citation omitted). The ultimate question is "whether the same events would have transpired if the employee had been younger than 40 and everything else had been the

same." *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir.1994) (citations omitted).

■ Generally, the employee has the burden of demonstrating that *each* proffered nondiscriminatory reason is pretextual. See *Russell v. Acme–Evans Co.*, 51 F.3d 64, 69 (7th Cir.1995). However, "[t]here may be cases in which the multiple grounds offered by the defendant ... are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff may [prevail.]" *Id.* at 70. If the employee produces evidence from which a reasonable jury could conclude that each reason is pretextual, the employee is entitled to a jury determination on that issue. See *Testerman*, 98 F.3d at 303; *Weisbrot v. Medical College of Wisconsin*, 79 F.3d 677, 681–82 (7th Cir.1996).

**(2)** *Whether AM General's Reasons were Pretexts for Discrimination.*

■ AM General's asserted "reasons" are: (1) Wilson's relationship with co-worker Goncz; (2) Wilson's relationship with TACOM; and (3) Wilson's relationship with O'Gara–Hess. Wilson argues that he provided sufficient evidence at trial to rebut each proffered reason. Moreover, Wilson argues that even if he did fail to rebut any one of AM General's alleged reasons for his discharge, he nevertheless presented evidence that the reasons given by AM General are collectively "fishy and suspicious" *see, e.g., Russell*, 51 F.3d at 70, for they lack even a "smidgen" of documentary proof. Wilson further asserts that during the course of the trial, Wilson and AM General's representatives engaged in a battle of credibility on equal terms, and that the jury simply sided with Wilson on the question of AM General's motivations for terminating him.

AM General argues that Wilson's testimony rebutting AM General's nondiscriminatory reasons is insufficient to meet his burden. The company cites our decision in *Russell*, 51 F.3d at 69, and argues that when an employer's nondiscriminatory reasons for terminat-

---

**1.** To establish a *prima facie* case, the employee must demonstrate that (1) he was in the protected age group; (2) he was performing to the employer's legitimate expectations; (3) despite his performance, he was discharged; and (4) substantially younger employees who were similarly situated were treated more favorably. See *Janiuk v. TCG/Trump Co.*, 157 F.3d 504, 506 (7th Cir.1998) (citations omitted).

ing an employee as part of a RIF include the decision-maker's perception that the plaintiff had performance related problems, the issue is not the adequacy in fact of plaintiff's performance; rather, it is the honesty of the company's belief that plaintiff's performance was inadequate that controls. Moreover, AM General argues that Wilson's testimony alone, offered on his own behalf and without other evidence, is insufficient as a matter of law to sustain a jury verdict.

At trial, Wilson testified that AM General failed to state its reasons for Wilson's termination at the time of his discharge, even though he had specifically inquired about the reasons during his exit interview. In fact, Wilson alleges the reasons did not surface until Mr. Wright's deposition was taken in this lawsuit. In addition, though his testimony was eventually disputed, Wilson testified that AM General representatives did not at any time complain to Wilson that his interpersonal skills needed sharpening, and in his opinion, he had virtually no problems getting along with TACOM or O'Gara–Hess. Finally, Wilson produced evidence that AM General was unable to locate Wilson's personnel file during discovery or otherwise, and that the company failed to produce (both in the general and the legal sense) any documentation explaining the rationale behind Wilson's termination.

▬ AM General asks us to find Wilson's testimony insufficient as a matter of law, and urges us to accept Wright's position. Though Wright disputed Wilson's testimony concerning the quality of Wilson's relationships, we are not quick to overturn the jury's judgment on the credibility of these witnesses, especially in an employment discrimination case "where the result frequently turns on sensitive and difficult factual questions involving motive, thus often making the credibility of the witnesses decisive." *Mathewson v. National Automatic Tool Co.*, 807 F.2d 87, 90 (7th Cir.1986) (citations omitted). A reasonable jury might very well have believed (and, it turns out, did believe) Wilson was more credible than Wright.

Moreover, even if Wilson's testimony *alone* was insufficient as a matter of law, the jury could have found a combination of factors sufficiently "fishy and suspicious" to warrant a verdict for Wilson. A number of factors were relevant: the virtual nonexistence of AM General files regarding Wilson's employment record, including the reasons for his termination; Wright's failure to disclose the reasons for discharge at the exit interview, in spite of Wilson's direct query; Wilson's past exemplary performance ratings; and Wilson's testimony. When taken in combination, these factors were sufficient to allow a reasonable jury to question AM General's alleged nondiscriminatory reasons. "When the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation: 'If the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one, such as age, may be rationally drawn.'" *Testerman*, 98 F.3d at 303 (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir.1990)).

In sum, we are convinced that Wilson presented sufficient testimony and other evidence that a reasonable jury could have found that AM General's proffered reasons were pretextual. As such, we affirm the district judge's denials of AM General's Rule 50 motions for Judgment as a Matter of Law.

B. *Whether the Trial Court Abused its Discretion when it Denied AM General's Rule 50(b) Motion for a New Trial.*

▬ AM General further alleges that it is entitled to a new trial because the district court abused its discretion in ruling on two "critical" evidentiary issues. A district court's denial of a motion for a new trial is reviewed for an abuse of discretion, *see Medcom Holding Co. v. Baxter Travenol Lab., Inc.*, 106 F.3d 1388, 1397 (7th Cir.1997), as is the judge's decision to admit or exclude evidence at trial. *See Jackson v. Bunge Corp.*, 40 F.3d 239, 246 (7th Cir.1994). AM General alleges that the trial court abused its discretion when it (1) prohibited testimony of AM General witnesses Armour and MacDougall who were not identified in AM General's mandatory disclosures filed pursuant to Fed. R.Civ.P. 26(a)(1); and (2) allowed Wilson to testify about Mr. Armour's statement that

"some of the senior, more mature people . . . would be surprised or impacted by the upcoming layoffs."

(1) *The Trial Court's Denial of AM General's Motion to Permit Armour and MacDougall to Testify as Impeachment Witnesses.*

 Nine months after Wilson filed his complaint alleging ADEA violations, AM General filed its mandatory *initial* disclosures pursuant to Fed.R.Civ.P. 26(a)(1), which included nine potential witnesses, only two of whom possessed "information regarding the decision to eliminate [Wilson's] position." The witness list failed to include James A. Armour or Thomas R. MacDougall, the company's in-house counsel. A subsequent amended witness disclosure similarly did not include these individuals, nor did AM General's Fed.R.Civ.P. 26(a)(3) Pretrial Disclosures.

Nevertheless, at trial AM General filed a motion to add Messrs. Armour and MacDougall to its trial witness list, alleging that these individuals would be called to testify "solely for impeachment purposes," and thus AM General's failure to name them in its Fed.R.Civ.P. 26(a)(3) Pretrial Disclosures did not preclude them from testifying at trial.[2] The district court denied the motion, finding that Armour and MacDougall were not rebuttal witnesses because AM General should have known before the trial even began that these individuals could testify to the allegedly nondiscriminatory reasons AM General gave for its decision to discharge Wilson. According to the court, "the knowledge of what would be proffered as a legitimate, nondiscriminatory reason was in AM General's possession all along . . ." and "[Armour and MacDougall] were potential witnesses from the beginning." As such, AM General should have named them in its mandatory disclosures. We agree. The proposed Arm-

our/MacDougall testimony was part of AM General's primary line of defense—that Wilson was selected for termination because of his poor relationships with AM General customers. If Armour and MacDougall counselled Wilson on this very issue, they should have been named in AM General's Pretrial Disclosures.[3] As such, we hold that the trial judge did not abuse his discretion when he denied AM General's motion.

(2) *The Trial Court's Admission of Testimony Regarding the Armour Remark.*

 Prior to trial, AM General filed a motion *in limine* in which it sought to exclude all evidence regarding the comment allegedly made by Mr. Armour, during his announcement of the new salary increase system, to the effect that "some of the more mature employees are going to be surprised with some of the actions we're going to have to take." The district court denied the motion.

AM General argues that when the trial judge ruled on its motion for summary judgment earlier in the case, he held that the remark was too ambiguous to support an inference of discriminatory intent. Based upon this comment, and the court's subsequent statement that the remark could not "support an inference . . . that at least part of the overall plan for the RIF was to get rid of older workers", AM General concludes that "[e]ssentially, the Court determined that the remark had no probative value whatsoever." As such, AM General argues, the court's reasoning demonstrates that the remark should not have been admitted. We disagree.

At the pretrial hearing on the motion *in limine*, the trial judge stated that just because the remark was insufficient standing alone did not necessarily mean it was inadmissible. The court concluded that the remark had potential probative value, and

---

**2.** Fed.R.Civ.P. 26(a)(3) states, in relevant part, that "a party shall provide to other parties the following information regarding the evidence that it may present at trial *other than solely for impeachment purposes:* (A) the name and, if not previously provided, the telephone number of each witness, separately identifying those who the party expects to present and those whom the

party will call if the need arises; . . . ." (emphasis added).

**3.** We note that Wilson attempted to subpoena Armour to testify at trial, but AM General fought the request, and the district court granted AM General's motion to quash the subpoena.

"since . . . a lay jury is perfectly competent to figure out what was meant [by the remark] . . . I don't see any substantial risk of . . . unfair prejudice." The remark could have been interpreted to mean that older employees were going to suffer, or it could have been understood to mean that employees who had been employed the longest were in trouble. The district court did not abuse its discretion in concluding that the jury was fully qualified to hear the comment and to assign whatever weight it felt appropriate.

## IV. CONCLUSION

We agree with the district court's denial of AM General's Rule 50 motions for Judgment as a Matter of Law. In addition, we hold that the trial judge did not abuse his discretion in ruling on the evidentiary questions of which AM General complains, and subsequently denying AM General's motion for a New Trial. The judgment of the district court is AFFIRMED.

MANION, Circuit Judge, joined by ILANA DIAMOND ROVNER, Circuit Judge, concurring.

I concur in the court's decision. I write separately to further address the issue of AM General's motion for judgment as a matter of law. We have often stated in cases like this one where we address the denial of a Rule 50 motion that once a discrimination case has been submitted to the jury, the *McDonnell Douglas* burden-shifting analysis drops out of the picture; the only issue in challenging a verdict is whether the jury's finding on the ultimate issue—intentional discrimination—is supported by the evidence. *E.g., Collins v. Kibort*, 143 F.3d 331, 335 (7th Cir.1998).[1] The parties' discussion of cases applying *McDonnell Douglas* is a distraction.

AM General's burden on appeal is to show that based on the record evidence the jury could not have found that AM General intentionally discriminated against Wilson because of his age. Here there is sufficient evidence to support the jury's finding of intentional discrimination. AM General concedes that it lied to Wilson about its motives for eliminating his position in the RIF. Although it was not much, Wilson presented some evidence that AM General's president had age-related animus. And the record evidence was sufficient to support the inference that AM General's late-proffered reasons for eliminating Wilson were lies. Such evidence indicated the real reason was intentional discrimination—the necessary second step for recovery. Telling was AM General's unexplained failure to produce Wilson's personnel file or other evidence corroborating the claimed conflicts with important clients or any supposed counseling regarding those problems. On this record, the jury was free to either infer intentional discrimination or reject that inference, but AM General cannot now complain about the jury's choice. In affirming we do not need to focus upon the marginally relevant cases addressing the *McDonnell Douglas* analysis relied upon by the parties.

---

1. It may in fact be more accurate to say that *McDonnell Douglas* drops out once a case goes to trial, that is, once it is past the summary judgment stage. The Rule 50 motion made after the jury's verdict is merely a *renewal* of the motion made prior to the jury deliberations. Cf. Fed.R.Civ.P. 50(a)(2) with Fed.R.Civ.P. 50(b); *see also Eastern Natural Gas Corp. v. Aluminum Co. of America*, 126 F.3d 996, 1000 (7th Cir. 1997) (motion waived if not made at close of proof); and *Mid–America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1364 (7th Cir. 1996) (motion waived if not renewed after jury verdict). And we have held that the renewed motion may not be based on any ground not raised in the original motion. *McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554 (7th Cir.1987); *see also Bay Colony, Ltd. v. Trendmaker, Inc.*, 121 F.3d 998 (5th Cir.1997) (same). Thus because we have repeatedly stated that the *McDonnell Douglas* analysis is irrelevant to the analysis of the renewed Rule 50 motion after the verdict, it must be equally irrelevant to the original Rule 50 motion made prior to the verdict.