In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3974

PAUL SCHUSTER,

*Plaintiff-Appellant,*

*v.*

LUCENT TECHNOLOGIES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 5228—**James F. Holderman**, *Judge.*

ARGUED JANUARY 13, 2003—DECIDED APRIL 28, 2003

Before POSNER, KANNE, and DIANE P. WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* Paul Schuster brought this suit claiming that his employment with Lucent Technologies, Inc. ("Lucent") was terminated because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (2003). Lucent denied age was the motivation for the discharge, stating that Schuster was terminated as part of an effort to address adverse financial conditions and to eliminate overlapping management positions. Lucent moved for summary judgment, contending that Schuster had not raised an issue of material fact that Lucent's proffered reasons for his discharge were only a pretext for age discrimination. The

district court granted summary judgment in favor of Lucent, and Schuster now appeals.

## I. HISTORY

Paul Schuster, born August 11, 1943, had been an employee of Lucent and its predecessor company, AT&T Bell Labs, since 1967. During his thirty-three years with the company, Schuster held various positions in hardware and software development. In 1997, Schuster teamed up with fellow employees Jim Weichel (born February 2, 1948) and Dan Fyock (born December 19, 1948) to help form Visual Insights, a unit within Lucent's New Ventures Group. Their goal was to create a viable business entity to manufacture, sell, and distribute data visualization technology, eventually spinning off from Lucent to stand as its own company. The data visualization technology they were developing was the creation of inventor Steve Eick (born December 12, 1957).

In December 1997, Lucent hired Douglas Cogswell (born October 15, 1955) as the Chief Executive Officer of Visual Insights, charging him with the task of turning Visual Insights into a profitable, self-sustaining business entity. Cogswell stated during his deposition testimony that his goal was to create an atmosphere that "was faster moving, was more amenable to a very rapidly changing marketplace, had a lower risk profile, and . . . was quick in decision making." Another senior manager gave testimony describing Cogswell's efforts as an attempt to create "a fast-paced, agile dynamic dot.com environment."

After Cogswell came on board, he put together a management team. Weichel became the Chief Operating Officer; Michael Tatelman (born November 12, 1956) was named Vice President of Marketing and Business Development; and Patricia O'Donnell (born July 3, 1956) was designated Vice President of Sales and Service. These three manage-

ment positions reported directly to Cogswell. Schuster held the title of Vice President of Product Development, reporting to Weichel. Two management positions reporting to Schuster were also filled: Susan Burkwald (born September 26, 1961) as Project Manager and Martin Biernat (born December 2, 1958) as Director of Software Development. As Vice President for Product Development, Schuster's responsibilities included determining which products would be developed, allocating resources among the various production projects, and managing the production processes for Visual Insights's products.

In the fall of 1998, Cogswell and the senior management began a search to obtain the outside capital necessary to spin off Visual Insights from Lucent, but by April 1999, they had been unable to secure this funding. Lucent, which was still supporting Visual Insights at this time, was unhappy with the company's high expense rate and below-target revenues. The high expense rate and low revenues also made Visual Insights an unattractive choice for potential investors. In an effort to reduce expenses, increase efficiency, and attract outside investors, Cogswell resolved to undertake significant, cost-saving changes in the venture's operations. This included reducing the overall size of Visual Insights by approximately twenty employees, eliminating positions that were not absolutely critical and looking for programs and staff groups where there was inefficient layering. In May 1999, Visual Insights implemented a reduction-in-force ("RIF"), eliminating the positions of fifteen employees. Later, during the summer of 1999, when further savings were required, senior management determined an additional RIF was necessary.

The second RIF was part of a larger plan to restructure the research and development area of Visual Insights, developed by Cogswell with the input of other members of the company's senior leadership, including Weichel, Tatelman, and O'Donnell. Under this restructuring plan,

one executive position, one developer, and one service manager would be eliminated. The three product-development-manager positions held by Schuster, Burkwald, and Biernat would be consolidated into one lower-level position. Lucent initially portrayed this as a choice of whether to retain Schuster or Eick in this consolidated capacity (as it turned out, Bill Hammond, born June 15, 1959, eventually filled this lower-level position, while Eick became a management-level Vice President). Comparing Schuster, as the manager of product development, with Eick, who actually invented the software at the core of Visual Insights's business, the management team determined that retaining Eick was more integral to the success of the venture. While acknowledging that Schuster was a valuable member of the management team, Cogswell and the senior leadership decided that it made better financial and strategic sense to retain Eick. On September 20, 1999, Schuster was notified that his position would be terminated as part of the second RIF, effective October 19, 1999.[1]

In November 1999, Visual Insights obtained the outside funding it had been seeking and was able to spin off from Lucent. Cogswell became CEO and President of the new Visual Insights, Inc., Weichel the Chief Operating Officer, Tatelman the Vice President of Marketing and Business, and O'Donnell the Senior Vice President of Sales. Eick was given a management-level position as the Chief Technical Officer and Vice President of Research and Development. Schuster's former responsibilities were absorbed by Eick as well as a new lower-level management position: Executive Director of Product Development, a position filled by Hammond.

---

[1] The second RIF resulted in the termination of five employees: Schuster (age 56), Dan Fyock (age 51), Sharon Adler (age 60), Susan Burkwald (age 37), and Martin Biernat (age 40).

Schuster's employment at Lucent ended on October 19, 1999, and he filed this lawsuit on August 24, 2000, alleging that his termination was motivated by age discrimination in violation of the ADEA. Lucent moved for summary judgment on the issues of both liability and damages, arguing that Schuster could not show that Lucent's proffered reasons for the termination were a pretextual cover for age discrimination. On October 12, 2001, the district court granted summary judgment in favor of Lucent on the issue of liability. We now affirm.

## II. ANALYSIS

We review a grant of summary judgment *de novo*, viewing all the facts and taking all inferences from those facts in a light most favorable to the nonmoving party. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 321 (7th Cir. 2001) (quotation omitted).

The ADEA prohibits an employer from "discharg[ing] any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1) (2003). To establish a claim under the ADEA, a plaintiff-employee must show that "the protected trait (under the ADEA, age) actually motivated the employer's decision"—that is, the employee's protected trait must have "actually played a role in [the employer's decision-making] process and had a determinative influence on

the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). Such a claim may be proven through direct evidence of the employer's discriminatory motive, or through the indirect, burden-shifting approach articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[2] Lacking any direct evidence of age animus on Lucent's part, Schuster here relies on the indirect method.

Under the *McDonnell Douglas* approach, a plaintiff-employee must first establish a *prima facie* case of discrimination. *Id.* This requires proof of four elements: (1) the employee is a member of the protected class (in an ADEA case, employees over 40 years of age, *see* 29 U.S.C. § 631(a)); (2) the employee was performing at a satisfactory level; (3) the employee was subject to an adverse employment action; and (4) the employee was treated less favorably than younger, similarly situated employees. *Krchnavy*, 294 F.3d at 875. If the plaintiff succeeds in making out a *prima facie* case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If such a reason is offered, "the plaintiff . . . bears the ultimate burden of showing that it is a pretext for discrimination." *Krchnavy*, 294 F.3d at 876 (citing *McDonnell Douglas*, 411 U.S. at 802, and *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000)). "To show pretext in a RIF case, an employee must establish that an improper motive tipped the balance in favor of discharge" or that "the

---

[2]   The Supreme Court, and subsequently this Court, has assumed that the *McDonnell Douglas* burden-shifting framework applies to age-discrimination cases. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996); *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 n.2 (7th Cir. 1998).

employer did not honestly believe in the reasons it gave for firing him." *Id.* (quotations omitted).

For purposes of its summary-judgment motion, Lucent conceded that Schuster could establish a *prima facie* case of discrimination. The company contends, however, that the business reasons it gave for the September 1999 RIF provide a legitimate, nondiscriminatory explanation for Schuster's termination. These reasons all center around the need to make Visual Insights a leaner, financially independent entity, both to reduce Lucent's costs (at this point, Lucent was still funding Visual Insights) and to make Visual Insights a more attractive prospect for outside investors. To meet this financial goal, the senior management proposed, quite sensibly, to eliminate management overlap and reduce the overall workforce size. Research and development was identified as a key area in which streamlining would lead to savings—in its brief, Lucent contends that it did not make fiscal sense to have three of its approximately 35 employees at that time engaged in *managing* the process of developing software, rather than actually *developing* it. This area was thus targeted by the management for savings, and Schuster, as Vice President for Product Development— along with Burkwald as Project Manager and Biernat as Director of Software Development, the two employees who reported to Schuster—was included in the second RIF.

In light of this legitimate, nondiscriminatory reason for the termination, the burden shifts to Schuster to demonstrate that the proffered explanation is merely a pretext for what was actually a discriminatory motivation. Pretext may be proven "directly with evidence that [an] employer was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Wade*, 243 F.3d at 323 (quotation omitted). A plaintiff-employee may proceed indirectly by attempting to show that the em-

ployer's "ostensible justification is unworthy of credence" through evidence "tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) (quotations omitted). That is to say, "[i]f the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one, such as age, may rationally be drawn." *Id.* (quotation omitted). Whether a court finds sufficient evidence to create an issue of material fact depends upon the entire record: "When a plaintiff uses the indirect method of proof, no one piece of evidence need support a finding of age discrimination, but rather the court must take the facts as a whole." *Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997) (citation omitted). We also note that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Testerman*, 98 F.3d at 303 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Even taking the facts alleged by Schuster in a light most favorable to him, we cannot say that he has raised a genuine issue of material fact as to the true reason for his termination. In reviewing the evidence offered by Schuster, we are well aware that "we deal with small gradations, with an employer's subjective comparison of one employee to another, and it is incumbent upon us to remember that what is at issue is not the wisdom of an employer's decision, but the genuineness of the employer's motives." *Id.* at 304. Based on the evidence presented, the reasons offered by Lucent—that Schuster was terminated as part of its restructuring efforts at a time of financial difficulty—appear based on sufficient facts to justify its decision and constitute the actual motivation for the termination decision it made.

In arguing that Lucent's proffered reasons are pretextual, Schuster first offers affirmative evidence that he says shows that Lucent was more likely than not motivated by discriminatory intent rather than any fiscal concerns. He points to several age-based derogatory comments made by members of the Visual Insights management team which, he argues, reveal their desire to remove or replace older workers. Among the comments cited by Schuster: Shortly after Cogswell began as CEO, he asked Schuster "how long [he] intended to remain employed" and "how long [he] intended to work." At one executive team meeting, Cogswell noted that while young employees are willing to work 100 hours per week, "more mature people aren't willing to do that" (Schuster fails to note that Cogswell went on to say that mature workers "make up for it with skills and experience"). At another meeting, Cogswell remarked that, "younger employees were more energetic and harder working and had a better work ethic." Tatelman, who Lucent admits was involved in the decision to terminate Schuster, was heard telling another employee, "You've got to think like a 25 year old . . . . Well, seriously, all the guys at Microsoft are 25" (this last comment was made approximately one month after Schuster had left Visual Insights).[3]

We have previously stated that age-based derogatory remarks made around the time of and in reference to an employment action are relevant to a finding of discrimination, *see Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001), but we have also noted that less directly related comments, in combination with other evidence, might support an indirect case under the *McDonnell Douglas* approach. *Id.*; *Fuka v. Thomson Consumer Elecs.*,

---

[3] We assume that both Cogswell and Tatelman were decision-makers when it came to the determination of whether to terminate Schuster's employment.

82 F.3d 1397, 1406 (7th Cir. 1996). The less direct the connection between the comment and the employment action—that is, if the comment was not made in temporal proximity to the employment action, or if the comment was not made in reference to that action—the less evidentiary value the comment will have. *See Huff*, 122 F.3d at 386 (noting that proximity in time to the alleged discrimination is an appropriate consideration when assessing probative value).

The district court found that these were "stray" workplace remarks that were insufficient to raise an issue of material fact as to the real reason behind Schuster's termination. *Schuster v. Lucent Tech., Inc.*, 2001 U.S. Dist. LEXIS 16662, at *13 (N.D. Ill. Oct. 12, 2001). We agree that the remarks cited by Schuster are too tenuously connected to the termination decision to raise a genuine issue of material fact as to the motivation behind the decision. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997) ("[Derogatory] comments cannot defeat summary judgment in favor of an employer unless they are both proximate and related to the employment decision in question.").

Cogswell's inquiry into Schuster's future employment plans was made some two years prior to Schuster's termination; his discussion of "mature people" and the work ethic of younger employees came approximately five months before the termination (and, as Lucent points out in its brief, may not have been derogatory at all). *Cf. Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir. 1998) (finding that a comment made five months prior to employee's termination was not temporally related to the discharge decision). Tatelman's references to 25-year-old employees came about one month after Schuster's termination. *Cf. Wichmann v. Bd. of Trustees of S. Ill. Univ.*, 180 F.3d 791, 801-02 (7th Cir. 1999) (finding that a comment made one month after an employment action was tempo-

rally related because it was meant to explain that action, but noting that a "seemingly stray workplace remark" may provide evidence of discrimination only if the remark is "related to the employment decision in question"), *vacated on other grounds, Bd. of Trustees of S. Ill. Univ. v. Wichmann*, 528 U.S. 1111 (2000). Because of the temporal distance between the comments and the termination decision, as well as the lack of any connection to that decision, the district court properly viewed them as "stray" workplace remarks, rather than evidence of the thought process behind Schuster's termination.

In addition, the cited comments may have less to do with age and more to do with business climate. This case arose at a time when the "dot.com" marketplace was intensely competitive. In order to succeed in that environment, Cogswell spoke of the need to "create a team that was faster-moving, was more amenable to a very rapidly changing marketplace . . . and . . . was quicker in decision making." O'Donnell testified that Cogswell's goal was "to migrate the company to a fast-paced, agile dynamic dot.com environment." Taking the Cogswell and Tatelman remarks in this context suggests that they may have been motivated less by age animus than by the realities of the marketplace. The district court noted that these comments "only establish the type of thinking that each person wanted Visual Insights to reflect. Neither comment suggests that either person wanted his subordinates to be a certain age, nor does either comment suggest that . . . an employee who thought in an appropriate manner would nonetheless [be] summarily dismissed because of that employee's age." *Schuster*, 2001 U.S. Dist. LEXIS 16662, at *15. While making any distinction between a person's mindset and his or her age may present a close question, such a potential distinction certainly reduces the likelihood that discrimination, rather than competitive desire, was the motivating influence for Schuster's termination.

Schuster next points to the fact that two younger workers—Eick at age 45 and Hammond at age 40—took over his responsibilities after he was terminated, which he argues is evidence of Lucent's plan to replace Visual Insights's older workers. Although it is true that these two employees did assume some of Schuster's former duties, that is not necessarily inconsistent with the company's assertion that the research and development area was ripe for eliminating management overlap and inefficient layering. The elimination of Schuster's position meant the number of executive-level managers at Visual Insights was reduced by one, one of the goals of the restructuring process. It is thus not surprising that some of Schuster's functions were absorbed by Hammond, a lower-level, less experienced (and thus, not surprisingly, younger) employee, and by Eick, creator of Visual Insights's software product, who many believed was "critical" to the success of the venture.

Relatedly, Schuster argues that we should view the second RIF as only including employees aged 50 or older, thereby suggesting that the terminations were motivated by age discrimination.[4] Schuster urges that we overlook the fact that two positions held by younger employees were eliminated as part of the second RIF, noting that these two employees had already expressed their intention to leave Visual Insights before the second RIF became effective. But as the district court observed, the *positions* held by these employees were nonetheless eliminated as

---

[4] Tied to this argument is Schuster's statistical evidence which he says indicates the probability that only age-50-plus employees would be included in the second RIF by chance is less than 1.28 percent. We need not address this statistical evidence because, like the district court, we do not accept Schuster's argument that only older employees were included in the second RIF.

part of the overall restructuring endeavor. It is significant to note, as did the district court, that no new employees were brought in to replace the five eliminated in the second RIF. Once these employees are seen as properly included as part of the second RIF, Schuster's argument that only older employees were targeted, providing evidence of age bias, is no longer persuasive.

Schuster next offers proof he says suggests that Lucent's proffered reasons for his termination serve simply as a smokescreen to cover up its age animus and are thus "unworthy of credence." *Testerman*, 98 F.3d at 303. The thrust of Schuster's argument here is that Lucent has changed its account of his termination in ways suggesting that none of its reasons can be considered legitimate. Shifting and inconsistent explanations can provide a basis for a finding of pretext. *See Statler v. Wal-Mart Stores*, 195 F.3d 285, 291 (7th Cir. 1999) (citations omitted). But the explanations must actually be shifting and inconsistent to permit an inference of mendacity. *See Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (noting that summary judgment in favor of the employer is proper if the proffered explanations are consistent "in substance if not word choice"). Even accepting that Lucent may have at times over-defended its decision, we believe that its overall account is substantially consistent with that of a company seeking to reduce costs and restructure in such a way as to attract outside investment.

In support of his inconsistency argument, Schuster notes that Lucent first claimed that Schuster's functions were being eliminated as part of the second RIF, but later acknowledged that some of those functions were transferred to other employees. Lucent also initially claimed that, in deciding whether to include Schuster or Eick in the RIF, it relied on talent profiles prepared for both, which gave Eick a slight advantage, therefore providing an additional age-neutral reason for terminating Schuster over

Eick.[5] Later, however, Cogswell stated in deposition testimony, for the first time, that he was concerned about Schuster's "performance" and "management style." By the time it moved for summary judgment, Lucent was relying on the specific issues with Schuster's performance, rather than the admittedly close talent profiles. Schuster argues that Cogswell's specific concerns with his work performance are at odds with the testimony of his supervisor and peers, as well as the high marks (albeit slightly lower than Eick's marks) on his talent profile.

Schuster contends that Lucent changed its story as to who played a role in Schuster's termination. He suggests that Lucent exaggerated Weichel's role in the decision-making process because of his age (while initially failing to note that Weichel opposed Schuster's termination) and minimized Tatelman's role because of his expressed affinity for the work ethic of the 25-year-olds at Microsoft. After initially claiming that Cogswell and Weichel were the decisionmakers, Lucent later admitted that Tatelman had participated in the decisionmaking process as well, and further acknowledged that Weichel had disagreed with the decision to terminate Schuster.

---

[5] Schuster also argues that Lucent's comparison of Schuster and Eick was contrived in order to bolster its case for terminating Schuster. Schuster questions why he was not compared with the other managers at his level (i.e., the Vice Presidents for Marketing and for Sales). He argues it was error for the district court to just assume that only the technical side of Visual Insights was ripe for elimination of inefficient layering. But as we noted earlier, we do not review "the wisdom of an employer's decision, but the genuineness of the employer's motives." *Testerman*, 98 F.3d at 304. Lucent's actions support its assertion that the technical side of the venture was the appropriate target for its restructuring efforts, and we do not question that decision here.

Finally, Schuster contends that Lucent attempted to disguise its efforts to remove older workers by including Biernat (age 40) and Burkwald (age 37) in the second RIF, even though those employees had already indicated their intention to leave Visual Insights. Inclusion of these two employees, the argument goes, was necessary since the other three employees included in the second RIF (Schuster, Fyock, and Adler) were all over 50 years old.

To avoid summary judgment in favor of Lucent, Schuster must do more than simply allege that the executives of Visual Insights are lying about their real reason for terminating him—under Rule 56, he must point to specific facts sufficient to cast doubt on the legitimate restructuring and financial reasons offered by Lucent, or which raise doubts as to the credibility of the executives' testimony. *See Rand*, 42 F.3d at 1146. He has failed to do so. As we have already noted, the fact that some of Schuster's functions were eventually absorbed by other, retained employees at Visual Insights is not surprising, given that the restructuring efforts were aimed at eliminating inefficient layering—that is, doing the same job with fewer employees. We also noted that inclusion of Biernat and Burkwald in the second RIF, even though they had expressed an earlier intention to leave, is consistent with the elimination of their *positions* as part of the restructuring efforts. Lucent's statements as to these two facts do not raise an issue of mendacity so much as acknowledge reality. The alleged last-minute switch from relying on Schuster's scores on his talent profile to relying on specific work-performance deficiencies as a rationale for his termination is an additional, not necessarily inconsistent reason for the employment decision, rather than an abrupt change in explanation. The allegedly changing story as to who actually participated in the decision to include Schuster in the second RIF is also insufficient to raise a question as to whether the restructuring reasons given are merely pretextual.

What Schuster's purported inconsistencies demonstrate is that Lucent was committed to an aggressive defense of its actions, perhaps leading it to occasionally over-defend itself. But Schuster has failed to raise a genuine issue as to the legitimacy of Lucent's proffered reason for terminating him: that, at the time of his termination, Lucent was seeking to streamline and restructure Visual Insights into a leaner, faster-moving outfit that would attract outside investors and allow it to spin off from its parent company. Given this legitimate, nondiscriminatory reason, and Schuster's inability to point to any specific facts which would call into question its veracity, we cannot say that Schuster "would not have been fired but for the employer's motive to discriminate on the basis of age." *McCoy v. WGN Broad. Co.*, 957 F.2d 368, 371 (7th Cir. 1992).

## III.  CONCLUSION

Schuster has presented insufficient evidence to raise a genuine issue of material fact as to whether Lucent's reasons for terminating him are merely pretextual. Therefore, summary judgment in favor of Lucent was appropriate, and the judgment of the district court is AFFIRMED.

A true Copy:

            Teste:

                                    _____
                                    *Clerk of the United States Court of*
                                    *Appeals for the Seventh Circuit*

USCA-02-C-0072—4-28-03