In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2420

RAE MCCANN,

*Plaintiff-Appellant,*

*v.*

BADGER MINING CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:18-cv-00073 — **James D. Peterson**, *Chief Judge.*

ARGUED APRIL 8, 2020 — DECIDED JULY 14, 2020

Before RIPPLE, BRENNAN, and SCUDDER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Rae McCann brought this action against her former employer Badger Mining Company ("Badger") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. She alleged that Badger discriminated against her on the basis of her age and disability when it failed to transfer her to a position in a different department and when it eliminated her

position as part of a reduction in force. After discovery, Badger moved for summary judgment on all claims. The district court granted the motion.

Before us, Ms. McCann maintains only that the district court erred in granting summary judgment to Badger on her disability claim related to the elimination of her position. Under the ADA, Ms. McCann was required to come forward with evidence that, but for her disability, Badger would not have eliminated her position. She did not meet that burden, and we therefore affirm the judgment of the district court.

# I

# BACKGROUND

## A.

Ms. McCann began her employment with Badger's predecessor, Atlas Resin Proppants ("Atlas"), at its Merrillan West facility[1] in September 2010. In early 2013, Ms. McCann applied for and obtained a laboratory technician position in the research and development ("R & D") laboratory. At her year-end evaluation for 2013, she received an overall appraisal of "Right on Track."[2] However, her supervisor noted some shortcomings in her ability to deal with conflict, work with others, communicate, and problem-solve with her coworkers. The review also noted some limitations in

---

[1] Atlas, which was a company that produced coated sand products for use in industrial applications, had three coating facilities: Taylor, Merrillan East, and Merrillan West. All of these facilities are located in Wisconsin.

[2] R.42-3 at 8.

Ms. McCann's ability to perform new tasks and in her ability to understand others' roles in the department.[3]

Until May of 2014, Cathleen Hegge supervised Ms. McCann. Following Hegge's departure, Erica Grant oversaw R & D, and Kimberly Breid became Ms. McCann's direct supervisor. At the time, the R & D department consisted of Breid, Weston Lewis (an engineer), and three laboratory technicians: Ms. McCann, Penny Higley, and Kory Kowahl, who specialized in conductivity and calibration tests. While she was Ms. McCann's supervisor, Breid (and other individuals on the management team) observed that Ms. McCann had difficulties getting along with others.[4] Higley also had problems getting along with her coworkers.

On March 16, 2015, Grant and Breid gave Ms. McCann her evaluation for calendar year 2014.[5] Again, her overall rating was "Right on Track";[6] however, her rating in a number of individual areas declined. For instance, she only "Sometimes" displayed mastery of "Ethics and Respect."[7] In this

---

[3] *See id*. at 3 (noting that "[s]ome new things are alarming to Rae, [ ](changes in documentation and routine) but she does get there" and that "[Rae] does seek to understand others['] jobs and challenges, but … if an initial interaction does not go well on solving a conflict between the two, Rae often gives up and resorts to talking it up to others").

[4] *See* R.57-1 ¶¶ 24–29.

[5] *See* R.42-4.

[6] *Id*. at 6.

[7] *Id*. at 2.

category, it was noted that Ms. McCann could be blunt, did not resolve disputes using the appropriate channels, and needed to stay out of others' disputes.[8] Ms. McCann admits that she had problems getting along with Higley, but maintains that she no longer had interpersonal problems once Higley left Atlas sometime after June 2014.[9]

Ms. McCann also received a "Sometimes" rating with respect to "Communication."[10] The review noted that she had a difficult time understanding instructions: "if everything isn't written down in the exact right order Rae will have questions and not proceed until they are answered."[11] The performance review also noted that she needed improvement in finding solutions to problems.[12]

In late 2014, there was a downturn in oil prices and, as a result, a downturn in the demand for Atlas's products. As of March 15, 2015, Atlas reduced its production schedule and requested that associates limit overtime hours. In a further attempt to survive the downturn in business, Atlas merged with Badger on April 1, 2015.

---

[8] *See id.*

[9] *See* Appellant's Br. 47–48 (admitting that "there was some friction in June of 2014 between Higley and McCann" and arguing that "Higley's employment with Badger Mining ended in 2014, as did McCann's perceived negativity").

[10] R.42-4 at 2.

[11] *Id.*

[12] *See id.* at 3.

Shortly after the merger, Ms. McCann began working on the night shift. According to Ms. McCann, she requested the change to avoid working with Kowahl.[13] Kowahl had difficulty controlling his temper,[14] and his ire sometimes was directed at Ms. McCann.

After the merger, Breid and Lewis (the R & D engineer) "were responsible for performing a multitude of functions within the R & D department," including "mixing new lab-batches of resin-coated products (a task which Higley had performed before she resigned from her employment in August of 2014)."[15] Given Breid's and Lewis's other responsibilities, Grant decided that someone else should be trained to perform this task and arranged for Breid to teach Ms. McCann batch mixing. According to Ms. McCann, this training consisted of "a single, two hour training session with Breid, during which Breid showed her how to mix a batch."[16] Ms. McCann recounts that, "[a]fter [she] observed Breid mixing a batch, McCann mixed a batch, alone, on her next night shift."[17] "Breid was not present when [she] mixed the batch and [she] did not ask Breid questions while mixing the batch on the night shift. McCann found mixing the batch to be easy and did not have any problems with mixing a

---

[13] *See* R.67 ¶ 229.

[14] *See id*. ¶¶ 216–18.

[15] R.57-1 ¶¶ 46, 49.

[16] R.67 ¶ 177.

[17] *Id*. ¶ 178.

batch."[18] She further notes that the one batch she mixed "was used by Badger," and that she "was not informed of any problems with the batch … or errors in the mixing procedure."[19] Ms. McCann later inquired if Breid wanted her to mix additional batches, but Breid told her "not to worry about the batches and that McCann needed to work on the ISO project."[20] Badger acknowledges that, "on one occasion McCann completed one of the assigned recipes," but explains that Ms. McCann "had numerous questions regarding the timing, amounts, and chemicals used in the *other* recipes which ultimately prevented her from completing them during her shift."[21] Given this experience and "Breid's past experiences with McCann, Breid concluded both that McCann could not competently and efficiently perform the mixing responsibilities and that it was too time consuming to keep repeating answers to the questions [she] raised."[22] Breid discussed the situation with Grant, and, "in approximately July of 2015, Breid and Grant began discussing options for having another laboratory technician—who could pick up the task quickly and perform it independently—assist with mixing batches, as well as performing other assigned tasks."[23]

---

[18] *Id.* ¶ 179.

[19] *Id.* ¶ 180.

[20] *Id.* ¶183.

[21] R.57-1 ¶ 55 (emphasis added).

[22] *Id.* ¶ 56.

[23] *Id.* ¶ 57.

Grant and Breid approached lab coaches Lisa Rodriguez and Rhonda Miller to identify other employees who could move into the R & D department to perform batch mixing. Both Rodriguez and Miller recommended Nathan Coblentz.[24] Coblentz had assisted in the R & D department on occasion, had expressed an interest in R & D, and could work independently.[25] Acting on these recommendations, Grant met with Coblentz on or about September 14, 2015,[26] to discuss his possible transfer. Grant wanted to transfer Coblentz immediately, but his present production team needed his help to complete a work-instruction project.

Prior to Coblentz's coming to the R & D department, Ms. McCann had been experiencing pain and numbness in her hands and, on September 2, 2015, sought treatment from Dr. Richard Rogge. Dr. Rogge diagnosed Ms. McCann with arthritis, ordered an x-ray, and confirmed changes in her hands. He also noted that "[t]his certainly could be just osteoarthritis from the repetitive motion and then it may be just warranted to treat this symptomatically."[27] Although Dr. Rogge prescribed medication, he did not place any restrictions on Ms. McCann's activities at that time. Ms. McCann had a follow-up visit with a physician's assis-

---

[24] *See id.* ¶¶ 59–61.

[25] *See id.* ¶ 63.

[26] Coblentz testified that this conversation occurred approximately three weeks before he started in R & D. *See* R.29 at 4 (Coblentz Dep. 14). He began in R & D on October 5, 2015.

[27] R.69-1 at 1.

tant in the orthopedics department on September 18; the physician's assistant noted "[b]ilateral hand degenerative joint disease … and bilateral carpel tunnel syndrome, all most likely related to overuse and some things she does for work and occupation."[28] The physician's assistant recommended, among other steps, some initial testing for carpal tunnel.

On September 21, 2015, Ms. McCann sent an email to Breid and copied Grant and Julie Casperson from human resources. In the email, Ms. McCann reported that she had been diagnosed with arthritis and carpal tunnel syndrome and that she would need time off for follow-up tests, appointments, and possibly two surgeries. She specifically requested to take off three shifts for appointments between September 30 and October 16. Casperson responded to Ms. McCann, expressing regret Ms. McCann was having so much pain in her hands and advising that Ms. McCann probably should start some paperwork for family medical leave and short-term disability. Casperson indicated that another individual from human resources, Greta, would be in touch with paperwork. Breid responded that Ms. McCann could have the time off. Ms. McCann's September 21 email was the first notice to anyone at Badger about Ms. McCann's hand condition.

After Ms. McCann informed Breid and Casperson of her hand condition, Casperson followed up with Breid to determine whether Ms. McCann's condition could be

---

[28] R.69-2 at 2.

work-related. Breid responded that Ms. McCann had indicated that her hands hurt worse after doing crush testing.

Because Ms. McCann was going to miss several days of work in the upcoming weeks, and may have been out for more extended periods of time, Grant believed that she needed to transfer Coblentz to R & D on a more expedited basis.[29] On September 22, 2015, Grant sent an email to Breid updating her on a conversation that she had had with Coblentz concerning his transfer; it states:

> Nate was at Taylor today and I mentioned to him that Rae would be in and out for the next few months (I didn't say why) and we might need some help. I told him I didn't want to step on your toes and that I hadn't officially talked to you on this yet but that you would be around tomorrow and we would discuss further. He was very interested and just ask[ed] that we keep Rhonda and Lisa in the loop if this is something you decide would make sense.
>
> Hopefully I didn't overstep my bounds here.
>
> We can discuss further in the morning.[30]

On October 5, 2015, Breid sent an email to McCann notifying her that Coblentz had been formally transferred to R & D and would be performing batch-mixing responsibilities.

---

[29] *See* R.22 at 14 (Grant Dep. 55–56).

[30] R.69-7.

Also in the late summer and early fall of 2015, management at Badger continued to explore ways that it could cut costs and increase efficiencies. Sometime in late August or early September, a meeting was held during which members of the leadership team discussed the possibility of layoffs and had preliminary discussions about who might be laid off. At that time, there was no formal list and "very limited" discussions of individuals who eventually might have to be laid off;[31] Beth Nighbor, who was in charge of human resources for Badger, does not recall Ms. McCann being mentioned.[32] On September 2, Lori Phillipi, Co-President of the Badger Advisory (leadership) Team, sent an email to other members of management outlining the timeline for cost-cutting measures. It read:

1) Have all cost cutting items to me by September 16. The Advisory team will be reviewing these on September 17th.

2) Don't wait to start implementing. Start knocking off low hanging fruit.

3) Be ready to share your cost cutting ideas at the next Advisory/Leader meeting on Oct 20. Also share any ideas that you already implemented.

4) Any staff changes will be handle[d] with the following timeline:

---

[31] *See* R.48 at 7 (Nighbor Dep. 22–23).

[32] *See id.* at 9 (Nighbor Dep. 32).

    a.  Have any staff reductions to Beth and Lori by September 16th.

    b.  First consideration will be given to people interested in early retirement. Those will be defined by October 1st, so adjustments can be made on teams that need to reduce staff. As always low performers will be the ones let go if teams have to reduce.

  C.  Packages will be developed for those losing their jobs. All terminations will be announced on one day at the end of October.

    Please keep this confidential! [33]

On September 29, all Badger employees over the age of sixty, including Ms. McCann, were offered an early retirement package. The employees had two weeks to act on the offer.[34]

---

[33] R.42-18.

[34] At the meeting in which Ms. McCann was offered early retirement, she advised Casperson and Nighbor that she was having trouble with her hands and told them that she had requested that Dave Goplin, in Safety Personnel, raise the height of her work table. Casperson immediately followed up with an email to Goplin asking if Ms. McCann had had "a conversation with you about some safety and ergonomic issues/concerns a few weeks ago? If so, have you looked into them and what is the status?" R.42-16. Goplin informed Casperson that he had assigned it to a subordinate who had failed to follow up. That same afternoon, Goplin gave instructions for Ms. McCann's table to be raised, and, the following day, he informed Casperson that the task had been completed.

Ms. McCann initially indicated to Breid that Coblentz would be "a great addition to the R & D group" and that she "look[ed] forward to working with him!"[35] However, the day after Ms. McCann received the news of Coblentz's transfer (October 5), she went to Breid and asked if Coblentz was replacing her. Breid informed Ms. McCann that the decision to transfer Coblentz to R & D had been made earlier. The timing of his transfer was designed "to ensure sufficient coverage in the event McCann had to be away from work for medical appointments."[36]

After this discussion, Ms. McCann went to speak to Casperson in human resources. Ms. McCann told Casperson about the discussion she had had with Breid and asked Casperson if Coblentz was being brought in to replace her. Casperson told Ms. McCann that she did not know what was going to happen with the R & D department and that she (Ms. McCann) would need to discuss that with Grant. Casperson also inquired whether Ms. McCann might be interested in transferring back to production, where she had worked before taking the position in R & D. Ms. McCann indicated that she would be.

On October 12, Ms. McCann still had not responded to Badger's early retirement offer. Consequently, Casperson emailed Ms. McCann to inquire whether she had made a decision regarding the offer; Casperson also asked Ms. McCann about her hands. Ms. McCann responded that

---

[35] R.42-13.

[36] *See* R.35 ¶ 13.

she had decided not to take the offer, reiterated that she was interested in transferring out of R & D, and informed Casperson that "[m]y hands are feeling great since I got the injections in them, so maybe that did the trick!!!"[37]

In the end, only six individuals accepted the early retirement packages, and involuntary staff reductions became necessary. Badger management determined that thirty-three positions across three facilities needed to be eliminated; this number included one position in R & D. Grant made the decision regarding the position to eliminate.[38] In doing so, she considered each R & D employee's 2013 and 2014 performance reviews,[39] her own knowledge and observations, and feedback from the team coaches.[40] The layoff criteria in Badger's employee handbook dictated that she apply the following criteria in order of importance:

- required job functions for production
- voluntary layoffs
- work habits and attitude
- prior work performance[.][41]

Grant, determined, and Ms. McCann admits, that Breid and Lewis (the engineer) had experience that was critical to

---

[37] R.36-3 at 1.

[38] *See* R.22 at 10 (Grant Dep. 39).

[39] *See id.* at 12 (Grant Dep. 46–48).

[40] *See id.* at 10 (Grant Dep. 39–40).

[41] R.37-4.

the R & D department and that they possessed skills that Ms. McCann did not have. Grant also determined that Kowahl's services were necessary because he was responsible for performing conductivity testing, a task that Ms. McCann never had performed by herself.[42] Thus, Grant's ultimate decision was whether Ms. McCann or Coblentz should be let go.

According to Grant, she considered each of their technical skills and concluded that Ms. McCann and Coblentz were equally skilled with respect to lab testing, but that Coblentz was more skilled at batch mixing. She also believed that, based on her past performance, Ms. McCann would not be able either to adapt to the changes in Badger's workforce or to work with limited direction and instruction; Coblentz, on the other hand, could "adapt to change, troubleshoot on the fly, and work with limited direction."[43] Grant also relied on the recommendation of Breid in making the decision. Ms. McCann was notified on October 26, 2015, that her position was being eliminated. Upon her separation, Badger provided Ms. McCann a letter of reference; the letter described Ms. McCann as "willing to learn and … a valuable member of her team" and as "flexible, prompt and reliable and quality focused."[44]

---

[42] *See* R.30 at 25–26 (McCann Dep. 100–02).

[43] R.37 ¶ 20.

[44] R.67 ¶ 277.

**B.**

Ms. McCann filed the present action on February 2, 2018. She alleged that Badger had discriminated against her based on her disability and age when it eliminated her position and failed to accommodate her. Following extensive discovery, Badger moved for summary judgment on all claims. The district court granted Badger's motion.

Pertinent to the issues on appeal, the district court observed that, to establish that she had suffered disability discrimination, Ms. McCann had to show that she was disabled within the meaning of the ADA, that she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation, and that her disability caused the adverse job action.

Turning to the first element—whether Ms. McCann was disabled—the district court noted that Ms. McCann had argued both that she was disabled and that Badger perceived her as disabled. It concluded, however, that it did not need to resolve this issue because Ms. McCann had not shown that her disability was the reason Badger had eliminated her position.

In reaching this conclusion, the district court considered the evidence upon which Ms. McCann relied to establish disability discrimination and concluded that it would not support a finding of discrimination. This evidence included: "suspicious timing," with her departure following closely on the heels of her revelation that she may need surgery; Badger management's discussion of how to handle Ms. McCann's hand issues; and evidence that Badger's purported reasons for retaining Coblentz were pretextual. With respect to pre-

text, the district court noted that, "[t]o create a genuine issue of material fact on the issue of intent, McCann must demonstrate that *all* of Badger Mining's reasons are pretextual."[45] Consequently, although the district court believed that there was a genuine dispute of material fact whether Coblentz possessed superior batch-mixing abilities, this disagreement did not defeat summary judgment because Ms. McCann had not come forward with evidence that Badger's other reasons for eliminating here position were pretextual. The district court therefore granted Badger's motion for summary judgment.

Ms. McCann timely appealed.

## II

## DISCUSSION

On appeal, Ms. McCann pursues only her claim that Badger eliminated her position because she was disabled. "To prove a violation of § 12112(a), a plaintiff must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503–04 (7th Cir. 2017) (quoting *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016)). Although the parties devote a significant portion of their submissions to the question whether Ms. McCann is disabled, we need not resolve that issue. Here, we agree with the district court that, even

---

[45] R.96 at 24 (citing *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 439 (7th Cir. 2014)).

assuming she is disabled, her disability was not the cause of the adverse job action.

To establish causation, Ms. McCann concedes that she "must show that … her employer would not have fired h[er] but for h[er] actual or perceived disability."[46] "Under *Ortiz v. Werner Enterprises, Inc*., the ultimate question in a discriminatory employment termination case is '[w]hether a reasonable juror could conclude that [the plaintiff] would have kept his job if he [was not disabled], and everything else had

---

[46] Appellant's Br. 30 (citing *Serwatka v. Rockwell Automation, Inc*., 591 F.3d 957, 962 (7th Cir. 2010)). Prior to the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110-325, 122 Stat. 3553, employers were liable for their discriminatory acts taken "because of" an employee's disability, and we interpreted this language to require "but for" causation. *See Monroe v. Ind. Dep't of Transp*., 871 F.3d 495, 504 (7th Cir. 2017). "One of the changes made to the statute under the ADAAA was to change the language from prohibiting employers from discriminating 'because of' a disability to prohibiting employers from discriminating 'on the basis of' a disability." *Id*. Several of our sister circuits have determined that this change in language has not altered the substantive standard, *see Murray v. Mayo Clinic*, 934 F.3d 1101, 1106 n.6 (9th Cir. 2019); *Natofsky v. City of New York*, 921 F.3d 337, 349–50 (2d Cir. 2019); *Gentry v. E.W. Partners Club Mgmt. Co., Inc*., 816 F.3d 228, 234 (4th Cir. 2016); *Lewis v. Humboldt Acquisition Corp., Inc*., 681 F.3d 312, 321 (6th Cir. 2012), but the question is still technically an "open" one in our circuit, *see Monroe*, 871 F.3d at 504. There seems little doubt that our sister circuits' approach is the correct one, *see Bostock v. Clayton Cty*., 2020 WL 3146686, at *4 (U.S. June 15, 2020) (quoting *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 350 (2013), for the proposition that "the ordinary meaning of 'because of' is 'by reason of' or 'on account of'"), however, we do not need to resolve the issue. Here, "the parties … have not argued that another causation standard should apply, so we will continue to apply the 'but for' causation standard." *Monroe*, 871 F.3d at 504.

remained the same.'" *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019) (alterations in original) (quoting *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)). One way to meet this burden—and one method Ms. McCann pursues—is for the plaintiff to "show[] that the stated reasons for the firing were pretextual." *Id.*

**A.**

"In evaluating pretext, 'the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge.'" *Id.* (quoting *Monroe*, 871 F.3d at 505). Pretext therefore "requires more than just 'faulty reasoning or mistaken judgment on the part of the employer'"; rather the plaintiff must show that the reason given "is [a] lie, specifically a phony reason for some action." *Id.* (alteration in original) (quoting *Monroe*, 871 F.3d at 505). With this standard in mind, we evaluate each of Badger's stated reasons,[47] mindful that its reasons may be interrelated or that one may be "so … suspicious" as to raise an inference of discrimination. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995).

**1**.

Ms. McCann first submits that Badger's assertion that "she refused to or struggled to mix batches" is a "deliberate

---

[47] Because we evaluate each of Badger's reasons, we need not decide definitively whether the district court took too crabbed a view of the evidence by relying on *Garofalo*, 754 F.3d at 439. *See supra* note 45 and accompanying text.

falsehood."[48] According to Ms. McCann, Badger has changed its rationale with respect to her batch-mixing skills. She submits that Badger initially maintained that she "refused to perform mixing tasks absent extremely detailed instructions and constant guidance from her leaders";[49] however, it later defended its actions on the ground that Ms. McCann had "struggled" with batch mixing.[50] She maintains that Badger's changing rationale constitutes evidence of pretext.

"Shifting and inconsistent explanations can provide a basis for a finding of pretext. But the explanations must actually be shifting and inconsistent to permit an inference of mendacity." *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) (internal citation omitted). It is not enough that an employer's word choice or phraseology change over time. *See id*. Here, Badger never argued that Ms. McCann "refused" to do any task in an insubordinate manner. Its argument always has been that she could not perform batch mixing "absent extremely detailed instructions and constant guidance from her leaders."[51] Therefore, Badger's rationale did not shift in a way to suggest it was a pretext.

Ms. McCann also claims that she has raised a genuine issue of material fact as to Badger's conclusion that she "had

---

[48] Appellant's Br. 39.

[49] *See* R.69-19 at 8 (response of Badger's counsel to Ms. McCann's charge of discrimination).

[50] *See* Appellant's Br. 39.

[51] R.69-19 at 8.

difficulty learning batch mixing responsibilities."[52] However, Ms. McCann's argument misses the mark. Pretext is not shown when an employer is "wrong about its employee's performance, or [is] too hard on its employee," but when the employer's proffered reason is "a lie." *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (quoting *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)). Here, after Breid trained Ms. McCann in batch mixing, Breid concluded that Ms. McCann could not perform this task efficiently and did not ask Ms. McCann to perform this task again.[53] Indeed, Breid began to look for a lab technician who could perform batch mixing, and Coblentz was recruited to perform that function. Once in R & D, Coblentz spent twelve to sixteen hours per week performing that task and considered himself "the batch mixer."[54] Consequently, regardless whether Breid's assessment of Ms. McCann's batch-mixing skills was accurate, Breid's subsequent actions establish that her belief was genuinely held: Breid did not believe Ms. McCann could fulfill those responsibilities and sought out another lab technician to do so.[55]

---

[52] Appellant's Br. 39–40.

[53] R.67 ¶¶ 182–83 ("After mixing a batch in July, 2015, McCann asked if they wanted her to mix any more batches. … In response to McCann's question, Breid told McCann no, not to worry about the batches … .").

[54] R.29 at 7, 10 (Coblentz Dep. 25, 40).

[55] In her reply, Ms. McCann acknowledges that a mere disagreement regarding her performance "would not be sufficient to support a finding of pretext." Reply Br. 12. She claims, however, that "the factual assertions" on which Badger based its assessment "are untrue and represent

(continued … )

**2.**

Ms. McCann also claims that Badger's other reasons for choosing to eliminate her position instead of Coblentz's — that she lacked self-direction and troubleshooting skills— were "implausible and unworthy of credence."[56] With respect to the first, she admits that, when she first started with R & D, "she had a learning curve."[57] Nevertheless, she sub-

---

( … continued)

things that did not happen, which can properly support a finding of pretext." *Id*. With respect to batch mixing, Ms. McCann states that she "was asked to and did mix a single batch, alone, on her night shift. McCann did not ask any questions while mixing the batch. McCann found the batch mixing to be easy and performed it without any problem." Appellant's Br. 40 (internal citations omitted). She claims this is "directly contrary to what Breid said—that McCann had multiple questions while mixing a batch on her own and could not complete other batch mixing assignments." *Id*. However, looking closely at the parties' statements, there is no inconsistency. Ms. McCann's statement focuses on her successful completion of *a single batch*. Breid acknowledges that Ms. McCann successfully mixed a single batch. R.57-1 ¶ 55 (noting that "on one occasion McCann completed one of the assigned recipes"). Breid asserts that Ms. McCann, however, had numerous questions regarding the timing, amounts, and chemicals used in the *other* recipes. *Id*. Ms. McCann asserts that she "did not ask Breid questions while mixing the batch on night shift." R.67 ¶ 179. However, Breid does not assert that Ms. McCann asked her (Breid) questions *while* on the night shift. Instead, Breid states that Ms. McCann had questions that could not be answered during Ms. McCann's night shift (because Ms. McCann worked alone) and that these lingering questions "prevented her from completing [the other batches] during her shift." R.57-1 ¶ 55.

[56] Appellant's Br. 41.

[57] *Id*.

mits that, if she had lingering problems in this area, Badger would not have allowed her to transfer to the night shift where she was "unsupervised and without any assistance available."[58]

Badger's acquiescence to Ms. McCann's transfer request, however, does not raise a material fact regarding the veracity of its belief that Ms. McCann had difficulties with self-direction or troubleshooting. In her review for 2014, which was given to Ms. McCann in March 2015, Breid noted that, "if everything isn't written down in the exact right order[,] Rae will have questions and not proceed until they are answered."[59] The performance review also noted that she needed improvement in finding solutions to problems.[60] Moreover, in her deposition, Ms. McCann acknowledged that, as of March 15, 2015, she understood that Breid had concerns about her ability to take initiative and to complete tasks without detailed instructions.[61] If she were provided with detailed instructions and confined to known tasks, she could do those alone without supervision. Indeed, as of summer 2015, Ms. McCann was doing almost exclusively crush-testing, a task that she was able to perform on her own, without direct supervision.

---

[58] *Id.*

[59] R.42-4 at 2.

[60] *See id*. at 3.

[61] *See* R.30 at 25 (McCann Dep. 99).

**3**.

Ms. McCann not only maintains that the reasons given for the elimination of her position were pretextual, she also contends that Badger lied concerning the criteria that it employed in reducing its workforce. She notes that "work habits and attitude" were among the stated criteria employed to determine who would be retained and who would be let go.[62] Ms. McCann submits, however, that if Badger truly had been concerned with employees' attitudes, Kowahl and Coblentz, who had issues with their coworkers, should have been laid off before her.[63] Again, however, Ms. McCann's argument is not supported by the record.

In making layoff determinations, Grant "adhered to the layoff criteria as identified in [Badger's] Associate Handbook."[64] The Handbook identifies "the following criteria *in order of importance*: [r]equired job functions for production[,] voluntary layoffs[,] work habits and attitude[, and] prior work performance."[65] Looking at "required job functions for production" or expertise, it is undisputed that Kowahl performed all of the conductivity and calibration tests for the R & D department.[66] Ms. McCann admits that Kowahl was

---

[62] R.37-4.

[63] *See* Appellant's Br. 45–46.

[64] R.37 ¶ 15.

[65] R.37-4 (emphasis added).

[66] *See* R.57-1 ¶¶ 118–20.

"more proficient" in these areas[67] and that she never had performed conductivity testing on her own.[68] Thus, unlike Ms. McCann, Kowahl "possessed unique areas of expertise, which were required in the R & D Department."[69]

Additionally, there is no evidence in the record that Grant was aware of Coblentz's interpersonal problems. Although other individuals at Badger—specifically Julie Casperson in human resources and Lisa Rodriguez—knew that Coblentz had encountered difficulties working with a coworker, Judy Thronson, Grant testified that, at the time she made the layoff decision, she had not been made aware of these difficulties.

Ms. McCann maintains that Grant's statement simply is not credible, that Casperson and Rodriguez must have provided this information to Grant, and that the district court made an improper credibility determination in concluding otherwise. At the summary judgment stage, however, it is not sufficient for a plaintiff, who bears the ultimate burden of proof at trial, simply to assert that a jury may disbelieve the defendant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986) ("We do not understand [our caselaw], however, to hold that a plaintiff may defeat a defendant's properly supported motion for summary judgment … without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely as-

---

[67] *See* Appellant's Br. 46.

[68] *See* R.30 at 25 (McCann Dep. 100).

[69] R.37 ¶ 16.

serting that the jury might, and legally could, disbelieve the defendant's denial … ."). "Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Id*. at 257. Ms. McCann does not come forward with any testimony from Casperson or Rodriguez, both of whom she deposed, that calls Grant's testimony into doubt. Indeed, Rodriguez testified that, when Breid and Grant approached her about finding a lab technician that would be a "good fit" in R & D, she recommended Coblentz.[70] The undisputed evidence in the record is that Grant had no knowledge that Coblentz had any of the interpersonal problems that Ms. McCann had evidenced in her years with Badger.[71] Consequently, there is no basis on which to conclude that Badger's application of its layoff criteria was pretextual or that its proffered reasons for eliminating Ms. McCann's position were pretextual.

## B.

In addition to arguing that Badger's reasons were pretextual, Ms. McCann maintains that the timing in her case is

---

[70] *See* R.28 at 7 (Rodriguez Dep. 27–28).

[71] Moreover, even if Ms. McCann were able to establish that Grant was aware of Coblentz's interpersonal problems, that evidence would not undermine Grant's conclusion, supported by Breid, that Coblentz would be better able to fill the needs of the R & D department because he was self-directed and could perform a greater range of tasks than Ms. McCann without constant supervision.

suspicious and therefore supports an inference that her posi-
tion was eliminated because of her disability. We have held,
repeatedly, that "'suspicious timing alone is rarely enough
to survive summary judgment' particularly when 'there are
reasonable, non-suspicious explanations for the timing of
[the] termination.'" *Milligan-Grimstad v. Stanley*, 877 F.3d 705,
711 (7th Cir. 2017) (alteration in original) (quoting *Morgan v.
SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013)).[72]

---

[72] As an initial matter, Ms. McCann quotes *Loudermilk v. Best Pallet Co.,
LLC*, 636 F.3d 312, 315 (7th Cir. 2011), for the proposition that whether
timing is suspicious and allows an inference of discrimination is a ques-
tion for "[a] jury, not a judge." However, in making this assertion,
Ms. McCann takes the *Loudermilk* quote out of context. In that case,
Loudermilk had handed his supervisor a note complaining about dis-
crimination, and his supervisor had fired him on the spot. In discussing
whether the timing of the termination was suspicious, this court stated:

> The discharge's timing also could support an adverse in-
> ference by a reasonable trier of fact. Suspicious timing
> may be just that—suspicious—and a suspicion is not
> enough to get past a motion for summary judgment. *See
> Lewis v. Chicago*, 496 F.3d 645, 656 (7th Cir. 2007). Occa-
> sionally, however, an adverse action comes so close on
> the heels of a protected act that an inference of causation
> is sensible. *See, e.g., Clark County School District v.
> Breeden*, 532 U.S. 268, 273 (2001) ("very close" temporal
> proximity can suffice); *Casna v. Loves Park*, 574 F.3d 420,
> 427 (7th Cir. 2009); *Spiegla v. Hull*, 371 F.3d 928, 943 (7th
> Cir. 2004); *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789,
> 796–97 (7th Cir. 1997). Deciding when the inference is
> appropriate cannot be resolved by a legal rule; the an-
> swer depends on context, just as an evaluation of context
> is essential to determine whether an employer's explana-
> tion is fishy enough to support an inference that the real

(continued … )

Here, Ms. McCann's revelation of her hand condition must be considered against the background of the reduction in force, the early retirement program, and the search for a lab tech who could perform batch mixing. Turning first to the reduction in force, it is undisputed that, by September 2, 2015, a preliminary plan and timeline had been established for staffing reductions: first early retirement packages would be offered and then further reductions would be made based on performance; team leaders were asked to provide cost-cutting measures by September 16. Grant provided her proposed measures for the R & D department on September 10. Consistent with the guidelines set forth on September 2—that early retirement would be offered before determining performance-based reductions—Grant noted that Ms. McCann "could be an option for early retirement."[73] Thus, the potential elimination of Ms. McCann's position was on the table prior to her giving notice of her hand issues; however, it was tied to the first stage of Badger's reduction plan—early retirement—as opposed to the second stage—

---

( … continued)

> reason must be discriminatory. The district court's ap-parent belief that timing *never* supports an inference of causation is untenable. The closer two events are, the more likely that the first caused the second. *We think that an inference of causation would be reasonable here*. A jury, not a judge, should decide whether the inference is appropriate.

*Id*. (second emphasis added) (parallel citations omitted). Thus, it was the unique facts of *Loudermilk* that made submission to the jury appropriate.

[73] R.42-19 at 2.

performance-based staffing reductions. On September 29, early retirement packages were extended to qualifying employees, including Ms. McCann. When Badger received the tepid response to its offers, it became necessary to consider more reductions on other bases. It therefore is not "suspicious" that Ms. McCann's position—and those of other employees—were identified for elimination in early October.

Ms. McCann also claims that Coblentz's transfer to R & D, which came close on the heels of her announcement of her hand problems, evinces Badger's motive to replace her because of her disability. However, Grant, Rodriguez, and Coblentz all testified that the process for hiring him into the R & D department was prompted by the department's need for a batch mixer, that the process began in the summer of 2015, and that it was completed prior to Ms. McCann's announcement that she was experiencing problems with her hands.[74] The transfer was delayed because of an on-going project with which Coblentz was involved in his current position. However, when Badger was made aware of Ms. McCann's need to miss work for appointments and possible surgeries, the timeline for the transfer was expedited as

---

[74] *See* R.22 at 8–9 (Grant Dep. 32–33) (describing a process of recruiting a lab technician that began in "the summer of 2015," receiving Rodriguez's recommendation of Coblentz "in August" of 2015, but initially delaying his transfer to R & D until a work-instruction project was finished); R.28 at 7 (Rodriguez Dep. 28) (stating that she recommended Coblentz "a few months before he actually got that position"); R.29 at 3–4 (Coblentz Dep. 12–14) (describing an interview with Grant three weeks before he was transferred "in late September or the beginning of October").

Grant explains in an email to Breid on September 22, 2015; it states:

> Nate was at Taylor today and I mentioned to him that Rae would be in and out for the next few months (I didn't say why) and we might need some help. I told him I didn't want to step on your toes and that I hadn't officially talked to you on this yet but that you would be around tomorrow and we would discuss further. He was very interested and just ask[ed] that we keep Rhonda and Lisa in the loop if this is something you decide would make sense.
>
> Hopefully I didn't overstep my bounds here.
>
> We can discuss further in the morning.[75]

Ms. McCann reads this email differently; she maintains that it establishes that Coblentz's transfer was conceived of, as opposed to merely effectuated, after her announcement. As the nonmoving party, she believes that she is entitled to this inference and that the inference raises a jury question. However, a plaintiff is entitled to "*reasonable inferences*" from the evidence, not those "supported by only speculation or conjecture." *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020) (emphasis added). Reading the email as expediting the transfer process is consistent with the testimony of every witness who was personally involved with Coblentz's transfer; Ms. McCann's reading, on the other hand,

---

[75] R.69-7.

is based solely on "speculation and conjecture." It does not raise a question to be resolved by a jury.

## C.

Finally, Ms. McCann maintains that there are "ambiguous statements of animus" from which disability discrimination can be inferred.[76] Specifically, she invites our attention to a number of emails between Badger human resources and management personnel discussing her hand condition. These reveal, for instance, that Casperson (from human resources) asked Breid whether Ms. McCann's condition might be work-related,[77] that Casperson attempted to replicate the crush test to determine if the repetitive motion caused Ms. McCann's injury,[78] and that Breid was trying to ensure coverage in the R & D department during the time that Ms. McCann was out for her medical appointments.[79] These emails, however, reveal nothing more than knowledge of Ms. McCann's health condition, a concern for the origin of her injury, and an attempt to cover any labor shortages resulting from her absences. An employer's knowledge of, and conscientious responses to, an employee's disability are not evidence of discrimination.

---

[76] Appellant's Br. 55.

[77] R.67 ¶ 98.

[78] *Id*. ¶ 114.

[79] *Id*. ¶ 123.

**Conclusion**

Ms. McCann has not come forward with evidence from which a reasonable jury could conclude that "but for" her disability, her position would not have been eliminated. Summary judgment in favor of Badger was appropriate, and we affirm the judgment of the district court.

AFFIRMED